## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| R&R Transportation, Inc., on behalf of itself and all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>Pilot Corporation; Pilot Travel Centers, LLC d/b/a/ Pilot Flying J; James A. Haslam, III; John Freeman; Brian Mosher; Mark Hazelwood; and Mitch Steenrod,<br><br>          Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Court File No.: _____

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

## <u>INTRODUCTION</u>

Plaintiff R&R Transportation, Inc. ("R&R" or "Plaintiff"), on behalf of itself and all others similarly situated, complain against Defendants Pilot Corporation, Pilot Travel Centers, LLC, *d/b/a* Pilot Flying J, and any affiliates, parents, subsidiaries, divisions, departments or agents, James A. Haslam, III, John Freeman, Brian Mosher, Mark Hazelwood, and Mitch Steenrod (collectively, "Defendants"), as follows:

1.     This action concerns Defendants' conspiracy to intentionally defraud Plaintiff and the Class out of contractual fuel discounts and rebates over a period of at least eight years in order to boost corporate profits and executive compensation.

2.     Defendant Pilot Flying J owns and operates the country's largest chain of truck stops with hundreds of travel centers nationwide. It is a privately held company with annual revenues exceeding $29 billion, the nation's number one retailer of diesel

fuel, and one of the country's largest restaurant operators.  Pilot Flying J has thousands of trucking and fleet customers, and is reported to be the sixth largest privately held company in the United States.

3.     To sustain its position as the leading retailer of diesel fuel, Pilot Flying J offers contracts for discounted diesel fuel to trucking companies and independent owner/operators. These discounts take the form of either a discount on the invoiced price at the pump or a monthly rebate on purchases.

4.     Defendants deliberately, systematically, and fraudulently reduced the discounts and rebates they owed to their customers under the contracts.

5.     On April 18, 2013, a federal court unsealed the affidavit of FBI Special Agent Robert Root, which the U.S. Government previously filed in the U.S. District Court for the Eastern District of Tennessee in support of an application for search warrants in its fraud investigation of Pilot Flying J.  The government filed the affidavit to demonstrate probable cause that "Pilot employees engaged in a conspiracy and scheme to defraud by deceptively withholding diesel fuel price rebates and discounts from Pilot customers, without the knowledge or approval of the customer, for the dual purposes of increasing the profitability of Pilot and increasing the diesel sales commissions of the Pilot employees participating in the fraud, in violation of 18 U.S.C. § 371 (conspiracy), 1341 (mail fraud), 1343 (wire fraud), and 1349 (conspiracy)."

6.     Plaintiff, for itself and the Class, incorporates herein by reference, adopts and alleges the detailed facts set forth in the FBI Affidavit, attached to this Complaint as

2

Exhibit A, in support of its claims and causes of action. The FBI Affidavit details systematic cheating of Pilot Flying J customers who purchased diesel fuel for commercial use from Pilot Flying J's fuel stations and travel plazas across the country. The scheme was executed by, among others, James Haslam, III, Mark Hazelwood, John Freeman, Brian Mosher, Mitch Steenrod, and other Pilot Corp. and/or Pilot Flying J executives and employees, who are listed in the FBI Affidavit as having participated in the scheme, but who are not named as defendants herein ("Co-Conspirators").

7.      Plaintiff, for itself and the Class, seeks to recover from Defendants their actual, consequential, and incidental damages, treble damages, equitable relief in the form of disgorgement of gross revenue earned on the withheld rebates and discounts, injunctive relief to stop Defendants from continuing their scheme, pre- and post-judgment interest, attorney's fees, litigation expenses, costs, and such other relief as the Court may find just and appropriate.

## PARTIES

8.      Plaintiff R&R Transportation, Inc. is a North Dakota corporation with its headquarters and principal place of business at 928 3rd Street, Audubon, Minnesota. R&R is a trucking company specializing in interstate, over-the-road logistics and transportation.  R&R entered into a contract with Pilot to receive a discount on purchases of diesel fuel.  Defendants defrauded R&R out of money pursuant to the misconduct described herein.

9.     Defendant Pilot Corporation, f/k/a Pilot Oil Corporation, is a Tennessee corporation with its principal place of business in Knoxville, Tennessee. It is headquartered at 5508 Lonas Drive, Knoxville, Tennessee 37909.  Pilot is a majority owner of Pilot Flying J, and through its officers, executives, and employees, along with Pilot Flying J executives and employees, operated, managed, and directed Pilot Flying J. Pilot intentionally engaged in the misconduct described in this complaint and obtained money from Plaintiff and Class members by fraudulently and intentionally reducing and withholding contractual fuel rebates and discounts owed to Plaintiff and Class Members.

10.     Defendant Pilot Travel Centers, LLC d/b/a/ Pilot Flying J is a Delaware corporation with its principal place of business in Knoxville, Tennessee. It is headquartered at 5508 Lonas Drive, Knoxville, Tennessee 37909.  Pilot Flying J owns and operates over 600 truck stops, travel centers and travel plazas in forty-four states nationwide under the Pilot Flying J brand, and is the largest truck stop chain in the United States.  Pilot Flying J engaged in the above described scheme to defraud and/or obtain money from Plaintiff and Class Members by fraudulently and intentionally reducing and withholding fuel rebates and discounts owed to Plaintiff and Class Members.

11.     Defendant James A. "Jimmy" Haslam, III is a citizen and resident of the Knoxville, Tennessee metropolitan area. At all relevant times Haslam was Chairman and CEO of Pilot Flying J. In this position Haslam exercised control, authority, responsibility and/or supervision over the Pilot Flying J executives, including corporate culture, operations, policies, procedures, the fuel rebate and discount program, and the conspiracy

4

to defraud Plaintiff and Class Members by fraudulently and intentionally reducing and withholding fuel rebates and/or discounts owed to Plaintiff and Class Members.

12.     Defendant Mark Hazelwood is a citizen and resident of the Knoxville, Tennessee metropolitan area.  At all relevant times, Hazelwood was President of Pilot Flying J and directly supervised by Defendant Haslam.  In this position, Hazelwood exercised control, authority, responsibility and supervision over Pilot Flying J executives and employees and the company's corporate culture, operations, policies, procedures, the fuel rebate and discount program, and the conspiracy to defraud Plaintiff and Class Members by fraudulently and intentionally reducing and withholding fuel rebates and discounts owed to Plaintiff and Class Members.

13.     Defendant John Freeman is a citizen and resident of the Knoxville, Tennessee metropolitan area. At all relevant times, Freeman was Vice President of Sales and directly supervised by Haslam.  In this position, Freeman exercised control, authority, responsibility and supervision over Pilot Flying J employees and the company's sales culture, operations, policies, procedures, the fuel rebate and discount program, and the conspiracy to defraud Plaintiff and Class Members by fraudulently and intentionally reducing and withholding fuel rebates and discounts owed to Plaintiff and Class Members.

14.     Defendant Brian Mosher is a citizen and resident of Bettendorf, Iowa. At all relevant times, Mosher was Director of Sales for National Accounts for Pilot Flying J and directly supervised by Defendant Haslam. In this position, Mosher exercised control,

authority, responsibility and supervision over Pilot Flying J employees and the company's sales culture, operations, policies, procedures, the fuel rebate and discount program, and the conspiracy to defraud Plaintiff and Class Members by fraudulently and intentionally reducing and withholding fuel rebates and discounts owed to Plaintiff and Class Members.

15.    Defendant Mitch Steenrod is a citizen and resident of Knoxville, Tennessee or the surrounding metropolitan area.  At all relevant times, Steenrod was and continues to be Chief Financial Officer of Pilot Flying J and directly supervised by Haslam.  In this position, Steenrod exercised control, authority, responsibility and/or supervision over certain Flying J employees and the financial planning and record-keeping of the company, as well as the fuel rebate discount program, and the conspiracy to defraud Plaintiff and Class Members by fraudulently and intentionally reducing and withholding fuel rebates and discounts owed to Plaintiff and Class Members.

## JURISDICTION AND VENUE

16.    This court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) because at least one Class member is of diverse citizenship from the Defendants; there are more than 100 Class members; and the aggregate amount in controversy exceeds $5,000,000.

17.    Venue is proper in this District under 28 U.S.C. § 1391(a) because as corporations or companies subject to personal jurisdiction in this District, the Defendants conduct business in this District, a substantial part of the events giving rise to Plaintiff's

claims occurred in this District, and Defendants have injured class members residing in this District. This Court accordingly has jurisdiction over this action, and venue is proper in this Judicial District.

## FACTUAL ALLEGATIONS

18.     In May 2011, the FBI began an investigation into potential unlawful activities based on information obtained from current and former Pilot Flying J employees involved in the Pilot Flying J fuel rebate and discount program.   In furtherance of this investigation, Special Agent Robert Root submitted an affidavit in support of a search warrant application, which was unsealed by the U.S. District Court for the Eastern District of Tennessee on April 18, 2013.  The affidavit details the facts of the FBI's investigation, and included detailed information regarding the nature and mechanics of the scheme, as well as the names, titles, and roles of those involved.

19.     Since 2005, Pilot Flying J represented to its customers that it would provide rebates or discounts on diesel fuel purchased at Pilot Flying J truck stops and travel plazas operating throughout the United States pursuant to diesel fuel price rebate and discount contracts.

20.     Pilot Flying J customers fall into two categories: (1) "Direct Billed Customers" who purchase diesel fuel from Pilot on credit extended by Pilot.  Direct Billed Customers would receive an invoice from Pilot on a periodic basis for the cost of diesel fuel purchased on credit with the agreed upon discount supposedly incorporated into the invoice; and (2) "Funded/Restricted Customers" who purchase diesel fuel from

Pilot using a credit source other than Pilot. Funded/Restricted Customers receive an agreed upon discount from Pilot for the purchase of diesel fuel in the form of a monthly rebate check.

21.    On or about May 4, 2011, a confidential source, referred to as "CHS-1", contacted the FBI to report knowledge of fraudulent activity by certain Pilot employees directed at Pilot customers.  CHS-1 advised the FBI that a current Pilot Flying J sales employee, referred to as "CHS-2", confided to CHS-1 that certain Pilot Flying J employees were intentionally defrauding customers by deliberately and deceptively withholding diesel fuel rebates and discounts without the knowledge or approval of customers, which resulted in Pilot charging the customers a higher price for diesel fuel than what was provided for in the discount and rebate contracts.  CHS-1 agreed to record conversations with CHS-2 regarding Pilot Flying J sales personnel's fraudulent conduct.

22.    Defendants' executives, directors, principals, sales agents, and administrative staff conspired to manually reduce the amount of payments contractually due to Plaintiff and Class in an effort to increase the profits made by the Defendants and the sales commissions made by their agents, without the consent or knowledge of Plaintiff and Class in violation of the rebate and/or discount program contract.

23.    Pilot Flying J advanced its diesel fuel fraud in two ways: (1) "Discount Fraud" also referred to as "managing the discount" and "jacking the discount," involved reducing a diesel discount agreement with a customer, without the customer's knowledge

8

or approval; and (2) "Rebate Fraud" which involves the reduction of a rebate amount due to a customer without the customer's knowledge or approval.

24.     If the customer's contract called for a rebate, the customer would pay the retail price for the fuel and thereafter receive a monthly rebate check. The amount of the rebate check was supposed to be for the difference between the pump price at the time of purchase and the fuel discount the customer had agreed to accept.  However, for Plaintiff and the Class, rather than honoring the fuel rebate deals struck with their customers, Defendants unilaterally withheld a portion of the rebate from the customer without the customer's knowledge. The result was a rebate check that was less than what the customer should have received, or a discount reflected on the fuel statement that was less than what the customer was supposed to receive.

25.     During recorded conversations between CHS-1 and CHS-2 beginning in June 2011 and continuing through 2012, CHS-2 advised that Pilot Flying J's Vice President of Sales, John Freeman, and Director of National Sales, Brian Mosher, were fraudulently withholding a portion of the rebate amount due to their customers who received monthly rebate checks.

26.     On October 2, 2012, federal investigators at the FBI and IRS contacted Cathy Giesick, who the investigators determined may have information relevant to their investigation of Pilot Flying J.  Ms. Giesick is a former employee of Pilot and until approximately January 2012 worked as a Regional Sales Manager selling diesel fuel to trucking companies. She worked under two directors of sales - first, Brian Mosher; and

second, Vincent Greco.   While based out of of Illinois and working under Mosher, Giesick's territory included Illinois, Wisconsin, Minnesota, North Dakota, South Dakota, and Iowa. While based out of Texas and working under Greco, Giesick's territory included Texas, Oklahoma, Arkansas, and New Mexico.

27.     Ms. Giesick confirmed that during her employment with Pilot, and while she was under Defendant Mosher's supervision, Mosher intentionally reduced monthly rebate amounts due to his customers, without the customers' knowledge, for the dual purposes of increasing the profitability of Pilot and increasing his sales commissions. Giesick explained the mechanics of Mosher's fraud on his Pilot customers, including the roles of Pilot's Regional Account Representatives, who are based at Pilot's headquarters in Knoxville, Tennessee, in determining and mailing the fraudulent rebate checks to Pilot's customers.   Giesick explained that she was encouraged to participate in this fraudulent conduct, and that her discomfort with it was one of the reasons for her departure from Pilot.

28.     Giesick explained that the Regional Account Representatives with whom she worked were Heather Jones and Karen Crutchman. Giesick explained that when a customer entered into an agreement with Pilot, Giesick contacted either Jones or Crutchman and told them the agreed-upon diesel discount deal.

29.     Giesick explained that Pilot permitted her to offer price discounts to trucking companies that varied based on the quantity of diesel fuel purchased by the company-the more diesel fuel purchased, the better the discount.

30.     Giesick explained that some customers received their discounts at the point of sale, while other customers received their discount in the form of a monthly rebate check.  She further explained that all monthly rebate amounts were calculated at and mailed from Pilot headquarters in Knoxville, Tennessee. However, by the time she left Pilot in January 2012, some monthly rebate customers were receiving their rebates via direct deposit.

31.     Giesick explained that one of reasons she left Pilot was because of her discomfort with Pilot's practice of intentionally lowering its customers' rebate amounts. She stated that while working for Mosher, she discovered that he was intentionally lowering the agreed upon discount rate for diesel fuel purchases and directing a reduced rebate payment to his customers. For example, if a Customer, based upon an agreed upon discount rate, was due a rebate of $10,000 at the end of the month, Mosher would cut the payment to approximately $7,500. Giesick explained that Mosher cut the rebates because it made more money for Pilot and it increased the commission that Mosher and any other Pilot sales person responsible for the Customer would receive.

32.     Giesick further explained that Mosher asked her not to inform Jonathan Duvall when Duvall joined Mosher's team.  Duvall is the son-in-law of Pilot's Chief Financial Officer Mitch Steenrod.  However, Duvall advised Giesick that he already knew about the fraud.

33.     Giesick further explained that Heather Jones, who also worked as Mosher's Regional Account Representative, would once a month send by e-mail an Excel file to

11

Mosher that listed all of the customers who were due a rebate amount and that listed the actual rebate amount due to the listed Customer pursuant to the price discount deal between the Customer and Pilot. Mosher would then engage in Rebate Fraud by typing into the Excel file the reduced amounts to be paid to Customer and returning the Excel file back to Heather Jones for her to execute the Rebate Fraud as directed by Mosher by having rebate checks prepared and sent to the customer for the reduced amount inputted by Mosher.

34.    Giesick advised she told Mosher that rebate reduction activities were not right. Mosher told her that it was okay to do because the customers did not know what they were getting. Giesick admitted that eventually she began to deceptively cut rebates herself by cutting rebates on the spreadsheet that Heather Jones provided and sending the spreadsheet back to Jones. Giesick also advised that Jones made deceptive rebate cuts on spreadsheets and sent them to Mosher for approval.

35.    Giesick advised that she was a participant in a meeting at Pilot's headquarters in Knoxville, Tennessee, that included Mosher, Hazelwood, Duvall and Haslam.  During the meeting Haslam thanked Mosher for saving Pilot money.  Later on during the meeting, at a time when Haslam may or may not have been present, Giesick recalled that Mosher told Hazelwood, and that Hazelwood acknowledged, that other employees within the organization were being promoted and that Mosher was making more money for Pilot by reducing Customer rebates.

36.     Giesick advised the FBI that another Regional Account Representative, Karen Crutchman, emailed Giesick spreadsheets that detailed the amount that a customer's rebate was deceptively reduced.  Crutchman also advised Giesick over the phone how much a customer's account should be reduced.  Crutchman also informed CHS-2 that she was cutting customers' discounts without their knowledge, that she maintained spreadsheets tracking her rebate and discount manipulations, and that if a customer did not receive daily pricing information they would have a difficult time detecting any rebate or discount reduction.

37.     Giesick informed that Pilot used Sales Force which is a cloud-based account management program that she accessed through www.salesforce.com using a username and password. Giesick advised that at the time that Giesick transferred from Mosher's sales region to Greco's sales region, Mosher asked Giesick to input into Sales Force what rebate deals her customers were supposed to receive and what they actually were receiving. Giesick entered that information into Sales Force as requested.

38.     Giesick further explained that Jones told her that after she cut a Customer's rebate as directed by Mosher, Heather Jones would manufacture back-up data to support the reduced rebate amount.

39.     According to Giesick, Mosher taught that if a customer caught that she was deceptively cutting rebate, Giesick should blame the error on a computer glitch.

40.     Giesick moved to Texas due to a change in her husband's job in 2009/early 2010.  Vincent Greco became her new regional supervisor.  At that time, Karen

Crutchman was the Knoxville-based Regional Account Representative with whom Greco primarily worked. Therefore, Crutchman also became Giesick's Regional Account Representative. Giesick stated that at some point, Crutchman admitted to Giesick that Crutchman was engaging in Rebate Fraud with Giesick's customers at Crutchman's own discretion. Giesick advised that Crutchman e-mailed her spreadsheets that detailed the amount by which a customer's rebate had been deceptively reduced. Giesick also advised that Crutchman would on occasion telephone her and verbally advise her of the amounts by which Giesick's customers' rebates would be deceptively reduced.

41. On October 4, 2012, the FBI and IRS contacted CHS-2, a current Pilot Regional Director of Sales. CHS-2 confirmed the existence of the Rebate Fraud described herein, and that it  involved the active participation for years of his supervisor, John Freeman, Pilot's current Vice President of Sales and its former Director of Sales for the South/Southeast Regions, and Brian Mosher, Pilot's Current Director of Sales for National Accounts and its former Director of Sales for the Midplains Region.

42. CHS-2 explained that following a corporate reorganization, his sales team absorbed Pilot employee, Rob Yuronich, whom Mosher supervised until August 2012- the approximate time of the corporate reorganization. Yuronich advised CHS-2 that Mosher engaged in Rebate Fraud with many customers that Yuronich oversaw. CHS-2 also explained that Pilot's Rebate Fraud is directed at both direct billed customers and restricted/funded customers.

14

43.    CHS-2 further advised that the Rebate Fraud has occurred with the knowledge of Pilot's current President Mark Hazelwood and Pilot's Chief Executive Officer James A. "Jimmy" Haslam, III, due to the fact that the Rebate Fraud-related activities have been discussed during sales meetings in Knoxville, Tennessee, in which Hazelwood and Haslam have been present. CHS-2 voluntarily provided the investigators with two documents that he had previously pinned to his bulletin board behind his desk. CHS-2 told the agents that he had printed the documents and placed them on his bulletin board, so that he would know where to find them, in the event he was ever contacted by law enforcement.

44.    CHS-2 stated that an example of Rebate Fraud directed at a direct billed customer occurred during the week September 24, 2012 when Vice President of Sales John Freeman directed Regional Sales Manager Kevin Clark, in CHS-2's presence, to change direct billed customer Schrock Trucking's price discount without alerting Schrock Trucking, and to just wait and see if Schrock Trucking catches it.

45.    After Giesick transferred to CHS-2's region and supervision, Giesick advised CHS-2 that Mosher had been engaging in Rebate Fraud with many of her customer accounts. Giesick also advised CHS-2 that Crutchman at that time maintained a spreadsheet of the Rebate Fraud affected accounts. Giesick asked CHS-2 how he wanted to handle the rebates. CHS-2 advised investigative agents that he ignored Giesick's question and asked Crutchman to forward him the spreadsheet. Crutchman forwarded the

15

spreadsheet by commercial carrier in a package addressed to CHS-2 at CHS-2's remote office.

46.    CHS-2 advised that the Rebate Fraud had been occurring at Pilot Flying J for more than five years and admitted that approximately eight years ago, they assisted Crutchman in a Rebate Fraud schemed against Mesilla Valley Trucking for about two years.

47.    Rob Yuronich is a current Pilot employee. His title is Regional Sales Manager. Yuronich works remotely and lives in Omro, Wisconsin. Yuronich was a Regional Sales Manager under Mosher's supervision.

48.    After Defendant Mosher's position changed in Pilot in 2012, CHS-2's sales team also absorbed employees Heather Jones and Rob Yuronich.  After Yuronich transferred to CHS-2's supervision, in approximately August 2012, Yuronich advised CHS-2 that Mosher had been engaging in Rebate Fraud with many of his customers. Yuronich advised CHS-2 that Mosher usually told Jones how to reduce the rebate. Yuronich asked CHS-2 how CHS-2 wanted to handle the rebate reductions now that Yuronich was under CHS-2's supervision. CHS-2 told Yuronich that he did not participate in the rebate reduction activity, but asked Yuronich to send him whatever document Yuronich was talking about during their discussion.  Jones, apparently at the instruction of Yuronich, sent a page from a spreadsheet by commercial carrier to CHS-2 related to Yuronich's customers affected by Rebate Fraud. Later, Yuronich told CHS-2

that Yuronich and Jones took care of it, meaning the Rebate Fraud decisions that Yuronich had previously raised.

49.     On October 17, 2012, the following conversation between CHS-2 and Rob Yuronich was consensually recorded in or about Lakeville, Minnesota:

**CHS-2**: Right. You know something you might want to be prepared, and I don't know for sure but I mean ... John, I don't know how much of the manual rebate stuff he does.  I think he does, he kinda encourages that or change in prices you know.

**YURONICH**: He's on that, that school of thought where you can...

**CHS-2**: Yeah. What I mean,[ ... ] you seem uncomfortable talking about it, and I you know, admire what you said, you don't, know, like doing that, but I need to understand what Brian was doing and how he was doing it.

**YURONICH**: Well there wasn't any rhyme or reason you know.  His first and foremost, his thought process was, was that he felt honestly that, that somebody doesn't know and isn't smart enough to know what their deal is and checking it and follow up, should I be
really be giving them the uh, the deal if I had to.  You know if you asked me that question.  I tell you "yeah you should" because that's (unintelligible, hereinafter "UI")

**CHS-2**: I agree with you.  I'm not, trust me, I'm not encouraging you to do that.

**YURONICH**: The other thing is that you will eventually get caught.  Somebody's gonna hook you up on it, whether it's a competitor or a fuel card, and I'm more worried about a fuel card.

**CHS-2**: Right. Right.

**YURONICH**: Showing you're wrong on that.

**CHS-2**: How does he, what does he do when it does come up?

**YURONICH**: He'll blame it on, 'oh we made this mistake and that mistake,' or whatever, and we'll make it right with you, sorry about that.

**CHS-2**: Has he gotten caught very often?

**YURONICH**: Well didn't he get caught with some big guy down in Iowa just recently?

**CHS-2**: Oh did he?

**YURONICH**: Yeah

**CHS-2**: What that like last week?

**YURONICH**: Whe, well when he was traveling with me he told that he was fixing, had to fix an issue, had to take some time to go and handle this issue with (UI) that he had. When he told me about it, it was a customer who uh I don't know if was uh Kevin Clark or whatever.

**CHS-2**: Morehouse

**YURONICH**: Was that the customer?

**CHS-2**: Yeah, Kevin, yeah.

**YURONICH**: And uh that was a deal where he lied to the customer.  He got caught, and
I don't want that to happen with these accounts that we're switching over and that we had and stuff like that. And you know that the thing is, and not a knock on me, but I can't tell lies 'cause I'm not smart enough to keep them straight. So you always stay in the ... always say what it is you don't have to worry about it.  I always want to have a good time.

**CHS-2**: Right

**YURONICH**: You know if, if, we're not making the right amount of revenue that we should make then uh, we got to adjust our deals.

**CHS-2**: Right

**YURONICH**: And do business that way.  But uh, you know when he would do the rebates he'd say see you know I just put forty thousand dollars more in your, in your, on your P&L, it's what you get paid by, so.

**CHS-2**: So he would have Heather collect the accounts ... kinda ... because you've got a spreadsheet

**YURONICH**: Yeah that's, I actually sent it to you tonight, so.

**CHS-2**: Oh, I never saw it.

**YURONICH**: You probably did (UI) I'm going to, it's one of those things that's on my list to do for you tonight, but so here's your accounts these are all on your manual rebates.  You need to go thru and (UI) ok this one's good, this one's good, well this wasn't eighteen thousand make it fifteen thousand.  This one's hundred and twelve thousand, make it ninety thousand.  And you go down thru a just do that, then some (UI) say you will change this, 'cause uh you know they're watching it.  They're, they know they know what OPIS is and they use an optimizer.  You know they can't do that with an optimizer.

**CHS-2**: Right

**YURONICH**: What have you, (UI) um then at the end you, (UI) say send it in, and you'd use round figures, and Heather would adjust it to make it look like you know, instead of fifteen thousand, fifteen thousand two hundred dollars fifty eight cents.

**CHS-2**: But Heather keeps that spreadsheet and sends it to uh you now?

**YURONICH**: Right look at …

**CHS-2**: Man I think Cathy told me one time he had like seventy accounts or he ever tell you how many he had just total?

**YURONICH**: Not that I mean what I have I've got seven or eight, but uh I'm just a small piece of what he was doing could very well could be, I mean he always felt if you could sell somebody the manual rebate before you do a off-invoice reflecting.

**CHS-2**: Um

**YURONICH**: So do it that way

**CHS-2**: Yeah. I mean I managing this now so I need to understand

**YURONICH**: Oh sure and your butt's in the kettle with mine, you know.

19

**CHS-2**: Exactly, exactly you know.

**YURONICH**: My uncomfortableness is just the mere fact, that I just I don't see it unethical, because I get it a little bit.  So I wouldn't say it's unethical.  I'm just uncomfortable with it, and the fact that when you get caught you have to do so much back peddling, you lose you lose a ton of credibility whether you can cover it with a story or not.  It's hard to operate that way.

**CHS-2**: Yeah

**YURONICH**: I always, I go with whatever place calls. I know where my check comes from. (laughing)

**CHS-2**: Right, right.

**YURONICH**: Sometimes you have to do the things that are uncomfortable as well.

***

**YURONICH**: (UI) there's so much that I'm still wrapping my head around, but I don't want to do anything that's outside of what the norm normal program should be, and I can't get that creative until I learn more as well but…

**CHS-2:** I'm not encouraging you to do that.

**YURONICH**: Nope.

**CHS-2**: I don't know, I don't know for sure what John Freeman's feel is on it, and you know, I'm still making sure I'm in my comfort zone with John so you know how to play that.

**YURONICH**: Yep.

**CHS-2**: I mean and you know so…

**YURONICH**: He's uh he's the overall boss [CHS-2 name], so if he condones that, wants it done that way, when the shit hits the fan he can't come back on us.

**CHS-2:** Right and then again all these are checks sent from us, the manual rebates?

**YURONICH**: Yep.

**CHS-2**: Cause I didn't think we'd wire anything or...

**YURONICH**: No it's all?

**CHS-2**: It's all a physical check?

**YURONICH**: Physical check.

**CHS-2**: Interesting.  And I'm just curious how much Brian is doing now.  Well, because you know we all get, we all get graded on our profitability

**YURONICH**: Right

**CHS-2**: And that's in the P&L right?

**YURONICH**: Yeah, it is, because your rebates are taken out and so if you add you know one hundred and ten thousand dollars worth of rebates and you've saved yourself fifty thousand dollars.

**CHS-2**: But we've built a column into the P&L for manual rebate amount so the actual that we physically paid the account not what they were due

**YURONICH**: Right

**CHS-2**: Is in the P&L?

**YURONICH**: Yep, it is, that is that I did verify cause (UI) just curious how it all reflected on the rebates, cause it was just a little while ago that we started see that in the P&L.  Cause I had never seen that and then they started reflecting the manual rebates in the P&L's. That was like five months ago.

**CHS-2:** Yeah, yeah.

**YURONICH**: (UI) they weren't in there before

**CHS-2**: Right. Now you said you don't have any notes of the discounts that they're supposed to get?

21

**YURONICH**: Not unless I wrote them.  I mean sometimes there's uh there's, there's no formal, uh, there's no formal, a lot of these account there's no formal letter of proposal and I totally get why we're doing it.  And why you want me to do it, one, its good it's a contract between you and me as a customer first and foremost but also practice, I'll show you that one deal there's a paper trail and I can tell you, you know like that deal (UI) Road Ready (UI)?  It's just a fucking note that he made what the hell does that mean?

\*\*\*

**CHS-2**: What is Heather say when you talk about this stuff?

**YURONICH**: She would so much, she just wants it to be what it supposed to be.  If we're giving the guy this, then that's what it should be worth.  She doesn't like uh the playing games with it and ...

**CHS-2**: She ever talk about their any, 'cause all the other sales reps are doing it, right? Don't they have a big, what's that?

**YURONICH**: I think so, yes.

**CHS-2:** She never talks about that though, uh. Cause I'm curious I need to talk to Karen about whether or not she needs to be doing any of that or…

\*\*\*\*

**CHS-2**: Brian gave you no files, paper files?

**YURONICH**: He never kept a fuckin' note one.

**CHS-2**: He didn't?

**YURONICH**: No, not on any of his accounts. Well, look at H.O. Molding here?

**CHS-2**: Well Heather has to know what the deals are supposed to be though, right?

**YURONICH**: Yeah, I mean sometimes she's got, ah, a "Brian" folder and her deal where she'll fold it over and put in here.

**CHS-2**: So she knows what the deal supposed to be, right?  'Cause that what it, that's how she comes up with the number, and then, you go back in…

**YURONICH**: Wait, yeah…

**CHS-2**: So she knows what the deals are.

**YURONICH**: Right, for the manual stuff, and that, yeah.

**CHS-2**: So something must have.  I mean, Brian must have told her what they were supposed to be at one point

**YURONICH**: Um, they are in the system, I mean, so let's say we are giving a guy cost plus 5, retail minus five, and on a manual rebate

**CHS-2**: Right

**YURONICH**: So, you know with some of them reflecting, uh retail minus five and we take the difference out of the cost plus five, uh

**CHS-2**: So they are getting retail minus five?

**YURONICH**: On the front side, and then you then you subtract that from
**CHS-2**: And they're set as reflected funding or they could be doing this as direct bill

**YURONICH**: They could be doing this as direct bill

**CHS-2**: Oh, then we'll tell them we are going to go back in and do a month end average or…

**YURONICH**: Or a cost plus five, monthly average.

**CHS-2**: Of all the business, not just the actual.

**YURONICH**: Less his five cent rebate he already got, and, and, that's the stuff that drives her nuts... so, well, any way, he said, I don't make notes and, uh, on sales reports.

**CHS-2**: Why is that?

**YURONICH**: I have no idea.

**CHS-2**: Well, he's got to create a trip report, right?

23

**YURONICH**: No, he doesn't do any of it.

**CHS-2**: Yeah he did

**YURONICH**: Here's H.O. Molding, there ain't a trip report written up.

\*\*\*

**YURONICH**: No, but he's, well, he will say that, 'I don't do any of those', 'cause I will
'What's your history on this account is it here?' I've never done that before, I don't do that. But Heather will do a job of a keeping some notes and attachments. She does a pretty good job of keeping that but there's some stuff from Cathy's era and stuff like that that's not in here…

50.     Consistent with what Yuronich told CHS-2 on October 17, 2012 during the recorded conversation, CHS-2 advised investigative agents that Yuronich indeed sent CHS-2 via email a copy of the spreadsheet maintained by Heather Jones that contains information related to Yuronich's customer accounts affected by the fraud described herein.

51.     Defendants and Co-Conspirators regularly taught the fraud scheme described herein to all of their sales personnel both in casual or on-on-one mentoring and in formal sales meetings.

52.     The FBI's recorded conversations between the confidential informants and coworkers further revealed that actions in furtherance of the diesel fuel fraud were taken with the apparent awareness and consent of CEO Haslam, President Mark Hazelwood, and Chief Financial Officer Mitch Steenrod.

53.     The conversations recorded by the FBI also reveal that Pilot took active steps to conceal their activities from customers and law enforcement officials.   For example, Pilot Flying J employees withheld relevant pricing information from customers who inquired about their rebate amounts.  If a customer caught a discrepancy, Pilot would blame the discrepancy on a "computer glitch."

54.     Due to the constant fluctuation of diesel fuel prices, and without access to corporate data that detailed the fraud, the nature of the scheme was particularly difficult for customers to detect. To know whether Defendants were manipulating the discounts or rebates owed to them, customers would have to obtain daily pricing for every truck stop in the country serving their trucks, then compare those prices to what they were invoiced, and then compare the discounts or rebates they received based on those purchases to the amounts they agreed to accept.  Defendants routinely targeted trucking companies that they considered "unsophisticated" or unlikely to catch on to the fraud.

55.     Defendants also targeted customers who utilized third-party credit lines such as PCTH, EFS, T Check, who Defendants referred to as "low hanging fruit."

56.     On February 5, 2013, Chris Andrews discussed the Rebate Fraud with CHS-2. Andrews stated that he was deceiving some customers in his old region about their diesel fuel price discounts, he agreed with the deceptive manual rebate practices that Brian Mosher taught on November 19, 2012, and that he tried not to detail his manual rebate activities in emails based on his experience in testifying before the Federal Trade Commission in connection with the Pilot/Flying J merger.

25

57.     On February 18, 2013, CHS-2 stated that John Freeman and Mark Hazelwood were discussing the potential for a new internal Pilot two-tiered "A" and "B" pricing structure to impose higher prices on less sophisticated customers, which would be knows as "Aunt Bea."

58.     On April 1, 2013, CHS-2 was informed by Crutchman that Pilot Flying J CFO Mitch Steenrod and General Counsel Kristen Seabrook requested that they be provided with information about Pilot's direct sales "manual rebate" practices. Crutchman also advised that Director of Inside Sales, Vickie Borden, requested that all Pilot Regional Account Representatives provide information to her regarding what rebate amounts had been paid to customers, compared with what rebate amounts should have been paid to customers.  Borden informed Crutchman that from that point forward, Seabrook would be approving rebate amounts.  Crutchman stated to CHS-2, "… we've had these happen before, look Western Express, that had been the biggest on that we've gotten caught, or had to go back and pay." "You just can't do stuff like this and it not come back to you."

59.     On April 9, 2013, Crutchman advised CHS-2 that General Counsel Seabrook requested Crutchman and every other Regional Account Representative supply Seabrook with all information necessary to review, calculate, and approve rebate amounts for customers that were scheduled to go out the week of April 15, 2013, as well as any document stating what rebate amount a customer should have been paid by Pilot Flying J compared with what was actually paid to the customer, any pricing information sent to a

customer, and any document showing an agreed upon diesel discount price for a customer.

60.    On Monday April 15, 2013, The FBI and Internal Revenue Service raided Pilot Flying J's corporate headquarters in Knoxville, Tennessee.  According to the FBI, there was probable cause to believe that Pilot Employees engaged in a conspiracy and scheme to defraud by deceptively withholding diesel fuel price rebates and discounts from Pilot Flying J customers, without the knowledge or approval of the customer, for the dual purposes of increasing the profitability of Pilot Flying J and increasing the diesel sales commissions of the Pilot Flying J employees participating in the fraud, in violation of 18 U.S.C. 371(conspiracy), 1341 (mail fraud), 1343 (wire fraud), and 1349 (conspiracy).

61.    Since the April 15 raid, five Pilot Flying J employees have pleaded guilty to conspiracy to commit mail fraud for their role in the fraudulent reduction of fuel rebates and discounts. They include Regional Sales Director Arnold Ralenkotter, Regional Accounts Representative Ashley Smith Judd, Senior Regional Sales Manager Jay Stinnett, who helped set up training sessions to teach others how to carry out the fraud, Regional Sales Manager Kevin Clark, and Account Representative Holly Radford.

### Plaintiff R&R Transportation's Experience with Pilot Flying J

62.    In late 2008, Pilot (as it was known prior to the 2009 merger with Flying J) contacted Plaintiff R&R Transportation to discuss a possible contract for discounted

diesel fuel.    Specifically, Plaintiff was contacted by Pilot employee Cathy Sokalowski. Ms. Sokalowski subsequently changed her name to Cathy Giesick.

63.    The parties engaged in negotiations and in late 2008 entered into a contract, which entitled Plaintiff to purchase discounted diesel fuel in exchange for purchasing a minimum of 120,000 gallons per month from Pilot stations.   When Pilot merged with Flying J in 2009, the newly merged company assumed the contract with Plaintiff and the parties continued on as they had to date.

64.   Plaintiff's contact and sales rep at Pilot Flying J was Cathy Giesick. Plaintiff's account was subsequently transferred to Jonathan Duvall and then to Rob Yuronich.

65.   Plaintiff's contract with Pilot Flying J called for Plaintiff to receive its discounts in the form of a rebate check.  Plaintiff received and paid weekly invoices for all of its diesel fuel purchases for the preceding week.  Pilot Flying J would then send Plaintiff a rebate check monthly, for all of the discounts it was owed on the previous month's purchases.

66.   From February 2009 going forward, Plaintiff purchased an average of approximately 140,000 gallons of diesel fuel from Pilot Flying J monthly, and received monthly rebate checks.

67.    At one point, Plaintiff felt that its rebate checks seemed to be less than it thought they should be.  Plaintiff contacted Pilot Flying J to ask if there was a problem. Pilot Flying J personnel immediately misled Plaintiff about the existence of any problems

or issues with Plaintiff's account.   Taking Defendants at their word, Plaintiff did not pursue the matter further.

68.   In April 2013, news of Defendants' fraud came to public light for the first time.   Immediately after these revelations, Plaintiff's rebate checks approximately doubled in amount.

69.   After hearing news of the alleged fraud and noticing its checks immediately and drastically increased, Plaintiff contacted Rob Yuronich, its Pilot Flying J contact, to state its concern that it had been victimized by fraud.  Yuronich informed Plaintiff that it could ask the company for an audit of its accounts.  Pilot Flying J immediately switched Plaintiff's account from a rebate-based discount to a discount administered at the pump.

70.   Plaintiff subsequently wrote to Pilot Flying J and asked for an audit of its account.  Rob Yuronich informed Plaintiff that Pilot Flying J was performing the audit. Yuronich further stated the Internal Revenue Service was also auditing Plaintiff's account.

71.   In a letter dated July 1, 2013, Defendants notified Plaintiff that, pursuant to the audit Plaintiff demanded after learning of the fraud, they had found "a potential discrepancy" in Plaintiff's accounts.  Defendants enclosed a check purportedly relating to the "discrepancies."  Defendants did not aver that the check purported to cover all of the losses Plaintiff suffered from the fraud.  On the contrary, Defendants stated, "[i]n the event we find additional issues involving your account, we will notify you[.]" Defendants

did not ask for, and did not obtain, the release of any legal claims and any amount remitted to date is inadequate under the facts and legal claims pled herein.

72.     Pursuant to the scheme described herein, Defendants defrauded Plaintiff out of money.   The exact amount of Plaintiff's losses due to the fraud is the subject of ongoing investigation.

## CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action on behalf of itself and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following nationwide Class, defined as:

> All persons or entities who purchased diesel fuel from Defendants Pilot Corporation and Pilot Travel Centers, LLC d/b/a Pilot Flying J pursuant to a diesel fuel rebate or discount program from January 1, 2005 to the present ("the Class").

74.     Specifically excluded from this Class are (1) the Defendants and their officers, directors, employees, subsidiaries, or affiliates: (2) all employees of the Court; and (3) all counsel of record. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

75.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**  The members of the class are so numerous that joinder of all members is impracticable.   While the exact number of class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that the Class numbers in the hundreds or thousands.

76.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(b)(3).** There is a well established community of interest in the questions of law and fact affecting the parties to be represented in this action. All members of the Class were affected by Defendants' breach of contract, and fraud.

77.     Questions of law and fact common to the Class predominate over questions that may affect only individual members of the Class. These common questions of law and fact include, but are not limited to:

a.   Whether Plaintiff and Class Members had valid contracts for fuel rebates or discounts with Defendants;

b.   Whether Defendants engaged in fraudulent conduct;

c.   Whether Defendants engaged in unconscionable, false, and deceptive acts or trade practice in violation of the states' Deceptive Trade Practices and Consumer Protection Statutes.

d.   Whether Defendants have been unjustly enriched by their diesel fuel rebate scheme;

e.   Whether there exists a valid RICO enterprise, through which Defendants carried out a pattern of racketeering activity that injured Plaintiff and the Class in their business and property;

f.   Whether Defendants have committed acts of racketeering, including but not limited to mail fraud, wire fraud, and bank fraud;

g.   Whether Defendants have engaged in a pattern of racketeering;

31

h.   Whether Defendants wrongfully converted consumer price rebates and discounts;

i.   Whether Defendants breached contracts with Plaintiff and the Class for diesel fuel rebates and discounts;

j.   Whether Defendants engaged in fraudulent concealment;

k.   Whether Defendants should provide restitution to Plaintiff and the Class;

l.   The amount and type of damages and other relief to be awarded to Plaintiff and Class; and

m.   Whether Plaintiff and the Class Members should be awarded attorneys' fees and costs.

78.   Resolving these issues for Plaintiff or any other Class members will also resolve the claims of the entire Class.

79.   **Certification of the class pursuant to Fed. R. Civ. P. 23(b)(3).** As alleged above, several common questions of fact and law predominate in this action. The overarching issue boils down to this: Did Defendants' fail to pay customers the correct amounts according to fuel rebate and discount contracts? Individualized issues related to damages carry no great weight in light of Defendants' obligation to provide fuel discounts and rebates pursuant to their contractual obligations. The common issues predominate over any individualized issues.

32

80.      **Typicality – Federal Rule of Civil Procedure 23(a)(3)**. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs have the same interests as all members of the Class in that the nature and character of the challenged conduct is the same.  Plaintiffs and all members of the Class challenge Defendants' conduct under the same legal theories. The primary and predominant issue in dispute is whether or not Defendants provided contractual fuel discounts and rebates to Plaintiff and Class in accordance with contractual obligations and representations.

81.      **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained competent counsel experienced in consumer class litigation. Plaintiffs are members of the Class and do not have interests antagonistic to or in conflict with members of the Class.  Neither Plaintiffs nor Plaintiffs' counsel have any interests that might cause them not to vigorously pursue this claim for the Class. Plaintiffs' claims are the same as those of the claims of the Class, which all arise from the same operative facts and are based on the same legal theories.

82.      **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Class.

83.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because the membership of the Class is so numerous and sufficiently geographically widespread that joinder of all members is impracticable. In addition, the prosecution of separate actions by individual members of the Class would create a risk of incompatible standards of conduct for Defendants and inconsistent or varying adjudications for all parties. Class treatment will permit a large number of similarly situated people to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually substantially outweighs any potential difficulties in management of this class action.

84.     There will be no difficulty in the management of this case as a class action.

85.     A class action is an appropriate method for the fair and efficient adjudication of this controversy.   The interest of class members in individually controlling the prosecution of separate claims against Defendants is non-existent because it is not feasible for them to bring individual claims. The nature of the practices complained of, defrauding similar customers in similar circumstances out of money using a common scheme, makes a class action superior.

86.     Damages in this case may be determined through use of Defendants'
records files, ledgers, electronic databases, among other places.

## COUNT I
## VIOLATIONS OF THE RACKETEERING INFLUENCED AND CORRUPT
## ORGANIZATIONS ("RICO") ACT, 18 U.S.C. § 1962(c)

87.     Plaintiff incorporates all preceding and succeeding allegations by reference
as if fully set forth herein.

88.     Section 1962(c) of the RICO Act makes it "unlawful for any person
employed by or associated with any enterprise engaged in, or the activities of which
affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in
the conduct of such enterprise's affairs through a pattern of racketeering activity or
collection of unlawful debt."

89.     As described herein, each Defendant (by and through its employees in the
case of Pilot Corporation and Pilot Flying J) have operated, managed, and used an
enterprise to obtain money and harm the businesses of Plaintiff and the Class through a
pattern of mail, wire, and bank fraud.   For instance, each of the Individual Defendants
(Defendants Haslam, Hazelwood, Mosher, Freeman, and Steenrod) individually used
Pilot Corporation and Pilot Flying J, individually, to obtain money and property from the
Plaintiff and Class through a pattern of mail, wire, and bank fraud.  All of the Defendants,
including the Individual Defendants and the Corporate Defendants (Pilot Corporation and
Pilot Flying J) used an association-in-fact enterprise comprised of all of the Defendants to

obtain money and property from the Plaintiff and Class through a pattern of mail, wire, and bank fraud.

90.    The Corporate Defendants, Pilot Corporation and Pilot Flying J, are each, separately, an "individual, partnership, corporation, association or other legal entity" and therefore each constitutes a cognizable enterprise under § 1961(4) of the RICO Act.

91.    In addition, each Defendant operated and managed an association-in-fact enterprise composed of Pilot Corporation, Pilot Flying J, Defendant Haslam, Defendant Hazelwood, Defendant Mosher, Defendant Freeman, and Defendant Steenrod to both conduct legitimate business and to obtain Plaintiff's money and property through a pattern of mail, wire, and bank fraud.  This association-in-fact enterprise was structured according to a specific business model, described herein, and constituted a stable group of willing participants with specific roles and bound by the legal endeavor of marketing and selling diesel fuel and related products, but who used the enterprise to commit acts of racketeering.

92.    Defendants Pilot Corporation and Pilot Flying J, by and through their officers and employees, each operated and managed the association-in-fact enterprise alleged herein by, among other things, among other things, serving as the legal business entities that underlied all of the contracts and all of the diesel fuel and other transactions with Plaintiff and the Class. Defendants Pilot Corporation and Pilot Flying J owned, operated and managed all of the diesel truck stops and internal systems that were used to carry out the fraud described herein.

93.     Defendants Haslam, Hazelwood, Freeman, Mosher, and Steenrod each operated and managed both the association-in-fact enterprise alleged herein, as well as Pilot Corporation and Pilot Flying J as legal entity enterprises by, among other things, serving as the executives and personnel responsible for implementing and perpetuating the fraud alleged herein.

94.     At all relevant times, Defendant James A. Haslam was Chairman and CEO of Pilot Flying J. In this position Haslam exercised control, authority, responsibility and/or supervision over the Pilot Flying J executives, including corporate culture, operations, policies, procedures, the fuel rebate and discount program, and the conspiracy to defraud Plaintiff and the Class by fraudulently and intentionally reducing and withholding fuel rebates and/or discounts owed to Plaintiff and the Class.

95.     At all relevant times, Defendant Mark Hazelwood was President of Pilot Flying J and directly supervised by Defendant Haslam.  In this position, Hazelwood exercised control, authority, responsibility and supervision over Pilot Flying J executives and employees and the company's corporate culture, operations, policies, procedures, the fuel rebate and discount program, and the conspiracy to defraud Plaintiff and the Class by fraudulently and intentionally reducing and withholding fuel rebates and discounts owed to Plaintiff and the Class.

96.     At all relevant times, Defendant Freeman was Vice President of Sales and directly supervised by Haslam.  In this position, Freeman exercised control, authority, responsibility and supervision over Pilot Flying J employees and the company's sales

culture, operations, policies, procedures, the fuel rebate and discount program, and the conspiracy to defraud Plaintiff and Class Members by fraudulently and intentionally reducing and withholding fuel rebates and discounts owed to Plaintiff and the Class.

97.     At all relevant times, Defendant Mosher was Director of Sales for National Accounts for Pilot Flying J and directly supervised by Defendant Haslam.   In this position, Mosher exercised control, authority, responsibility and supervision over Pilot Flying J employees and the company's sales culture, operations, policies, procedures, the fuel rebate and discount program, and the conspiracy to defraud Plaintiff and Class Members by fraudulently and intentionally reducing and withholding fuel rebates and discounts owed to Plaintiff and the Class.

98.     At all relevant times, Defendant Steenrod was Chief Financial Officer of Pilot Flying J and directly supervised by Haslam.   In this position, Steenrod exercised control, authority, responsibility and/or supervision over certain Flying J employees and the financial planning and record-keeping of the company, as well as the fuel rebate discount program, and the conspiracy to defraud Plaintiff and the Class by fraudulently and intentionally reducing and withholding fuel rebates and discounts owed to Plaintiff and the Class.

99.     Pursuant to its contract for discounted diesel fuel, Plaintiff R&R received weekly invoices for diesel fuel purchases by e-mail from Defendant Pilot Flying J.  Each of the Defendants caused these invoices to be sent.  These invoices caused Plaintiff to

send checks to Pilot Flying J via fax to satisfy the invoices, which in turn caused Plaintiff's financial institutions to distribute money to Defendant Pilot Flying J.

100.   Additionally, Plaintiff R&R received monthly rebate checks via U.S. Mail from Defendant Pilot Flying J.  Plaintiff deposited these rebate checks with its financial institutions.

101.   Each of the invoices and rebate checks sent by Defendant Pilot Flying J to Plaintiff pursuant to the contract between the parties was fraudulent because tainted by the misconduct described herein.  Even if certain rebate checks at certain times were not fraudulently reduced, they were still fraudulent because issued in order to keep Plaintiff performing under the contract under false pretenses.

102.   Defendants' predicate activity of mail, wire, and bank fraud described was carried out at least from 2005 until April 2013, when Defendants fraud was brought to light by the FBI's affidavit.   Defendants' racketeering thus constituted a closed-ended pattern in violation of the RICO Act.

103.   Defendants are the sole and proximate cause of Plaintiff's losses. Defendants cannot plausibly assert that any intervening fact other than the scheme described herein caused Plaintiff's checks to be fraudulently lower than what Plaintiff was entitled to.

104.   Plaintiff and members of the Class have suffered serious injury to their business and property as a direct result of Defendants' racketeering.   Plaintiff paid

Defendants millions of dollars from February 2009 to the present to purchase diesel fuel under false pretenses.

## COUNT II
## VIOLATIONS OF THE RICO ACT, 18 U.S.C. § 1962(d)

105.   Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

106.   In the alternative to their substantive violations of §1962(c), each of the Defendants is criminally culpable under §1962(d) as conspirators to violate the RICO Act.

107.   As described herein, each of the Defendants, by and through their officers and employees in the case of Defendants Pilot Corporation and Pilot Flying J, agreed that the acts of racketeering alleged herein would be committed against Plaintiff and the Class.

108.   As described herein, each of the Defendants was aware of the acts of racketeering being committed against Plaintiff and the Class, agreed that they should be committed, and carried out acts in furtherance of the conspiracy.

109.   Defendants' conspiracy was successful.   The conspiracy, and the substantive violations of the RICO Act that arose from the conspiracy, caused Plaintiff substantial injury to its business and property.

110.   Plaintiff and members of the Class have suffered serious injury to their business and property as a direct result of Defendants' racketeering.   Plaintiff paid

40

Defendants millions of dollars from February 2009 to the present to purchase diesel fuel under false pretenses.

## COUNT III
## BREACH OF CONTRACT

111.   Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

112.   Plaintiff entered into a valid and enforceable contract to receive fuel discounts from Pilot Flying J.

113.   Plaintiff and Class Members performed all of their obligations under the contract, including by patronizing Defendants' truck stops and purchasing diesel fuel.

114.   Defendants breached the contract by intentionally reducing and withholding monthly fuel rebates or discounts that were contractually owed to Plaintiff and the Class.

115.   Defendants' breach of contract resulted in damages to Plaintiff and the Class. As a direct, proximate and foreseeable cause of Defendants' breach of contract, Plaintiff and members of the proposed Class have sustained damages, in the aggregate in excess of $5,000,000.

## COUNT IV
## FRAUD

116.   Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

41

117.   Defendants made intentional material misrepresentations regarding diesel fuel rebates and discounts contracts with customers, the amounts of discounts and rebates owed to customers, and engaged in conduct amounting to active concealment and fraud.

118.   During the class period, Defendants engaged in a pattern of misrepresentations and omissions of material fact regarding the fuel discounts and rebates due to Plaintiffs and Class, which Defendants knew to be false, or without regard to whether they were true or not, and with the intent that such statements would be relied upon and induce Plaintiffs and Class to enter into fuel discount and rebate contracts, with a purpose to defraud Plaintiff and the Class.

119.   Plaintiff and the Class reasonably and justifiably relied on Pilot's misrepresentations and/or omissions of fact regarding their promise to provide contractual fuel discounts and rebates.

120.   As a direct and proximate result of Defendants' fraud, Plaintiff and the Class were injured and suffered damages.

## COUNT V
## FRAUDULENT CONCEALMENT

121.   Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

122.   Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful conduct.

123.   Defendants falsely attributed the diesel fuel rebate scheme to "computer glitches" with the intention of concealing the true nature of their wrongful conduct.

Defendants prepared false back up reports and data to provide customers in order to conceal their fraudulent activity.

124.   Defendants did not inform Plaintiff or the Class that Defendants were withholding diesel fuel rebates and falsifying discounts.  Accordingly, until the FBI's affidavit was unsealed, Plaintiff and Class Members could not have discovered the true nature of the misconduct alleged herein.  Defendants secretly conducted their diesel fuel rebate scheme, concealed the nature of their unlawful conduct through various means designed to avoid detection.

125.   As a result of Defendants' fraudulent conduct, all applicable statutes of limitations affecting the Plaintiff and Class Members' claims have been tolled. Plaintiff and the Class did not discover, nor could have they discovered through reasonable diligence, that Defendants were engaged in fraud because of the deceptive practices employed by Defendants to avoid detection and affirmatively conceal such violations.

**COUNT VI**
**VIOLATIONS OF MINNESOTA'S DECEPTIVE TRADE PRACTICES ACT,**
**MINN. STAT § 325D.12; § 325D.44, AND CONSUMER FRAUD STATUTE,**
**MINN STAT. § 325F.69**

126.   Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

127.   Defendants provided Plaintiff and the Class with "merchandise" defined as "objects, wares, goods, commodities, intangibles, real estate, loans, or services." Minn. Stat. § 325F.65 subd. 2.

128.   Defendants violated Minn. Stat. § 325F.69 subd. 1 which provides that "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in § 325F.70."

129.   Defendants also violated Minn. Stat. § 325D.44 which provides that: "A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:… (11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."

130.   If Plaintiff and the Class knew that Defendants would not provide the fuel rebates and discounts as represented, they reasonably would not have purchased diesel fuel from Defendants.   Plaintiff would have purchased diesel fuel and entered into discount contracts with other diesel fuel providers rather than have their discounts fraudulently reduced.  Defendants therefore obtained an unfair economic advantage and obtained Plaintiff's business unfairly.

131.   The substantial harm caused by Defendants' business practices outweighs any benefit, justification, or motivation of the Defendants.   Plaintiff and other participating consumers could not have reasonably avoided or anticipated Defendants' fraudulent reduction of discounts and rebates that were properly designed and contracted

for.  Plaintiff's free market decisions were unjustifiably hampered by the conduct of the Defendants.

## COUNT VII
## VIOLATION OF STATE DECEPTIVE TRADE PRACTICE AND CONSUMER PROTECTION STATUTES

132.    Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

133.    Plaintiff, in addition to the claims alleged above, brings this claim on behalf of itself and the members of the Class.  Each of the Class members brings this claim on its own behalf under the law of the state in which the Class member resides and contracted for fuel rebates and discounts, and on behalf of each of the Class Members residing in and having contracted for fuel rebates and discounts in the same state as it does.

134.    During the Class Period, Defendants engaged in unconscionable, false, and deceptive acts or trade practices by engaging in fuel Discount and Rebate Fraud as alleged herein. Defendants' conduct in instituting the fraud constitutes a deceptive trade practice in violation of states deceptive trade practices acts.

135.    Defendants misled and deceived Plaintiff and the Class by reducing diesel fuel rebates and discounts in violation of contractual agreements, and without their knowledge or consent. Defendants profited from rebate funds and discounts wrongfully withheld from Plaintiff and Class Members.

136.   Plaintiff and each of the other members of the Class is a purchaser or other person entitled to the protection of the deceptive trade practices act of the state in which they reside and in which they contracted for and received fuel rebates and discounts.

137.   All of the consumer protection states have enacted statutes designed to protect consumers against unfair, deceptive, fraudulent, and unconscionable trade and business practices that further allow consumers to bring private or class actions.  Plaintiff and Class members hereby assert violations of the following statutes:

Alabama:
Ala. Code § 8-19-5

Alaska:
Alask. Stat. § 45.50.471, et seq.

Arizona:
Ariz. Rev. Stat. Ann. § 44-1522, et seq.

Arkansas:
Ark. Code Ann. § 4-88-101, et seq.

California:
Cal Bus. Prof. Code § 17200, et seq., 17500 et seq.
Cal. Civ. Code § 1750, et seq.

Colorado:
Colo. Rev. Stat. Ann. § 6-1-101 et seq.

Connecticut:
Conn. Gen. State. Ann. §§ 42-110(a)-(g)

Delaware:
6 Del. Code §§ 2511-2537

District of Columbia:
D.C. Code § 28-3904

Florida:
Fla. Stat. §§ 501.201- 501.213

Georgia:
Ga. Code Ann. § 10-1-370, et seq.; § 10-1-393, et seq.

Hawaii:
Haw. Rev. Stat. §§ 480-2(a); 481A-3

Idaho:
Idaho Code § 48-601 - 619.

Illinois:
815 ILCS 505/2; 815 ILCS 510/2(a)(5), (a)(7), (a)(12)

Indiana:
Ind. Code § 24-5-0.5-3(a)(1), (a)(2)

Iowa:
Iowa Code § 714.16

Kansas:
Kan. Stat. Ann. § 50-626(a); 626(b)(1)(A), (D), (F), (G); 626(b)(2), (3).

Kentucky:
KRS §§ 367.110 - 367.990

Louisiana:
La. Rev. Stat. § 51:1401, et seq.

Maine:
Me. Rev. Stat. Ann. § 206-214

Maryland:
Md. Code Ann. Com. Law § 13-301(1); (2)(i); (2)(iv); (3); (9)(i)

Massachusetts:
Mass. Gen. Laws Ann., Ch. 93A, §§ 1-11

Michigan:
Mich. Stat. Ann. §§ 445.903 (3)(1)(c), (e), (s), (z), (bb), (cc); Mich. Stat. Ann. § 19.418

Mississippi:
Miss. Code Ann. § 75-24-5(2)(e), (g)

Missouri:
Mo. Ann. Stat. §§407.010- 407.701

Montana:
Mont. Code. Ann. §§ 30-14-101 - 30-14-224

Nebraska:
Neb. Rev. Stat. Ann § 59-1609; Id. at § 87-303(a)

Nevada:
Nev. Rev. Stat. §§ 598.0903 - 598.0999; Nev. Rev. Stat. § 41.600

New Hampshire:
N.H. Rev. Stat. Ann. §§ 358-A:2; 358-A:2(V); 358-A:2(VII)

New Jersey:
N.J. Stat. Ann. §§ 56:8-1, 56:8-1-24

New Mexico:
N.M. Stat. Ann. § 57-12-3, § 57-12-2 (5), (14)

New York:
N.Y. G.B.L. §§ 349 - 350

North Carolina:
NC General Statutes § 75-1 *et seq.*

North Dakota:
N.D.C.C. §§ 51-12-01, 51-15-02

Ohio:
Ohio Rev. Code § 1345.02 (A), (B)(1)- (B)(2); §4165.01 *et seq.*

Oklahoma:
Okla. Stat. Ann. tit. 15, §753 (2), (3), (5), (20), tit. 78, § 53

Oregon
Or. Rev. Stat. §646.608(1)(e), (g), (t), (u); §646.608(2)

Pennsylvania:
73 Pa. Stat. Ann. §201-3; §201-2(4)(ii); (v); (vii); (xxi)

Rhode Island:
R.I. Gen. Laws § 6-13.1-2. 6-13.1-1(5)(E), (L), (M), (N)

South Carolina:
S.C. Code § 39-5-20(a)

South Dakota:
South Dakota Codified Laws § 37-24-6(1)

Tennessee:
Tenn. Code §§ 47-18-104(a), (b)(5), (b)(7), (b)(21), (b)(27).

Texas:
Tex. Bus. & Com. Code
§17.46(b)(2), (b)(3), (b)(5), (b)(7), (b)(24).

Utah:
§13-11-4(1), (4)(2)(a), (4)(2)(b), (4)(2)(e), (4)(2)(i); § 13-11-19

Vermont:
9 Vt. Stat. §§ 2451-2462

Virginia:
Va. Code §59.1-200(A)(2), (3), (5), (14); Va. Code §59.1-683 with § 18.2-216.

Washington:
Wash. Rev. Code §§ 19.86.010, *et seq*.

West Virginia:
W.Va. Code § 46A-6-102(7)(B), (C), (E), (G), (L), (M); § 46A-6-104

Wisconsin:
Wisc. Stat. § 100.18(1)

Wyoming:
Wyo. Stat. § 40-12-105(a)(i), (ii), (iii), (xv)

138.   As a proximate result of Defendants' deceptive trade practices, Plaintiff and the members of the Class have suffered actual damages in an amount to be proven at trial.

139.   Defendants' actions were willful, wanton, malicious, and in disregard of the rights of Plaintiff and Class Members. Defendants knew or should have known, in light of the surrounding circumstances that their conduct in violation of states' Deceptive Trade Practices act would result in damages to Plaintiff and Class Members.  Defendants continued their wrongful conduct with malice or in reckless disregard of the consequences, from which malice may be inferred.

140.   Plaintiff and Class Members are entitled to any and all penalties and/or multipliers of damages as may be provided for in the states deceptive trade practices acts.

141.   Plaintiff and Class Members are entitled to an award of reasonable attorneys' fees, costs of this action, plus pre and post judgment interest as allowable by law.

## COUNT VIII
## UNJUST ENRICHMENT

142.   Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

143.   As a result of Defendants' fraud, Plaintiff and the Class overpaid Defendants for diesel fuel.  Plaintiff and the Class conferred substantial benefits upon Defendants, and Defendants wrongfully received and retained these benefits.

144.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiff and the Class.  It thus would be unjust or inequitable for Defendants to retain the benefit without restitution or disgorgement of monies overpaid to Defendants, or such other appropriate equitable remedy as appropriate, to the Plaintiff and members of the Class.

## COUNT IX
## CONVERSION

145.    Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

146.    Through the misconduct described herein, Defendants wrongfully converted dollars owed to Plaintiff and the Class for contractual rebates for their Defendants' own use.

147.    Plaintiff and the Class are entitled to the money to which they are legally entitled, and which Defendants have withheld and converted.  Defendants agreed and promised to fully and faithfully pay rebate funds to Plaintiff and Class Members but failed to do so.

148.    As a direct and proximate result of Defendants' conversion, Plaintiff and the Class sustained damages.

149.    Plaintiff and Class Members are entitled to a return of all rebate funds and discounts wrongfully converted by Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and all others similarly situated, prays for relief against Defendants as follows:

1. An Order certifying this case as a class action pursuant to Fed. R. Civ. P. 23, appointing Plaintiff as Class Representative, and Plaintiff's Counsel as Class Counsel;

2. An award of treble damages to Plaintiff and the Class;

3. An award of all other damages allowable under the law to Plaintiff and the Class;

4. An award of restitution to Plaintiff and the Class;

5. An order of all equitable relief allowed by law;

6. An order requiring Defendants to pay reasonable attorneys' fees, costs and disbursements;

7. All other relief allowed at equity or law; and

8. All other relief the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

**ZIMMERMAN REED, PLLP**

Date: July 3, 2013

s/ Brian C. Gudmundson

Charles S. Zimmerman, MN 120054
J. Gordon Rudd, Jr. MN 222082
Brian C. Gudmundson MN 336695
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
Email: charles.zimmerman@zimmreed.com
Email: gordon.rudd@zimmreed.com
Email: brian.gudmundson@zimmreed.com

Michael D. Hausfeld
James J. Pizzirusso
HAUSFELD LLP
1700 K Street, NW
Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfeldllp.com
Email: jpizzirusso@hausfeldllp.com

*Attorneys for Plaintiffs and the Proposed Class*